**UNITED STATES DISTRICT
COURT SOUTHERN DISTRICT OF
OHIO EASTERN DIVISION**

| | |
|---|---|
| C.C., an individual,<br><br>        Plaintiff,<br><br>        v.<br><br>**WYNDHAM HOTEL & RESORTS, INC.;<br>RED ROOF INNS, INC.; and<br>RED ROOF FRANCHISING, LLC.**<br><br>        Defendants. | Case No. 22-cv-3799<br><br>**JUDGE** _____<br>Related Cases: No. 19-cv-849<br>                No. 21-cv-4933<br>                No. 21-cv-4934<br>                No. 21-cv-4935<br>                No. 21-cv-5022<br>                No. 22-cv-1924<br>                No. 22-cv-2682<br>                No. 22-cv-2683<br>                No. 22-cv-2690<br>                No. 22-cv-2734<br>                No. 22-cv-3185<br>                No. 22-cv-3202<br>                No. 22-cv-3203<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

COMES NOW, the Plaintiff C.C. ("Plaintiff" or "C.C."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

**INTRODUCTION**

1.      Plaintiff C.C. is a survivor of human sex trafficking.

2.      C.C.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3.      C.C. met two people that groomed her into trafficking. Ultimately her traffickers came to control every aspect of her life. The defining factor of the relationship between C.C. and her traffickers, was that each night, C.C.'s traffickers forced her to have sex with men for money.

1

4.  C.C. was trafficked in hotels owned by Defendants[1] Wyndham Hotels & Resorts, Inc. ("Wyndham"), Red Roof Inns, Inc., and Red Roof Franchising, LLC.[2] C.C.'s traffickers rented hotel rooms for one purpose—a location to engage in sex trafficking.

5.  At Defendants' hotels, C.C. was forced to engage in sex with many men every day. Every new customer was another instance C.C. was forced to have sex against her will—that is to say, C.C. was raped multiple times per day by multiple men when she stayed at Defendants' hotels.

6.  C.C.'s traffickers forced her onto Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7.  At some point, C.C. was able to escape the grasps of her traffickers and the prison of Defendants' hotel rooms.

8.  C.C. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

9.  C.C. brings this lawsuit in an attempt to hold the Defendants that imprisoned her accountable for their role in her trafficking.

## OVERVIEW OF TRAFFICKING

10.  A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

11.  For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines

---

[1] Throughout this Complaint, when Plaintiff refers to "Defendants," that statement is alleged as to all Defendants named in this action, including Wyndham, Red Roof Inns, Inc., and Red Roof Franchising, LLC. In the instances when Plaintiff alleges a fact as to only one Defendant, or some number of Defendants less than the total, the Complaint clearly names the Defendant to which the allegation is made.
[2] Defendants Red Roof Inns, Inc. and Red Roof Franchising, LLC will be collectively referred to as "Red Roof."

and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking occurring on their properties.

12. Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their brand flags.

13. Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

14. The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[3] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15. Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' own properties. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

---

[3] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

16.     The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Defendants and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

17.     Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of C.C. on their properties.

18.     C.C., a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595 and Child Abuse Victim's Rights Act, 18 U.S.C. § 2255. Each Defendant, knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

**PARTIES**

19.     Plaintiff C.C. is a natural person and a resident and citizen of Youngstown, Ohio.

20.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

      a.  Due to the sensitive and intimate nature of the issues, Plaintiff C.C. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[4]

---

[4] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the

b.  Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[5] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[6] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[7]

c.  Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.  Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[8]

e.  Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket

---

party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[5] Fed. R. Civ. P. 10(a).

[6] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[7] Fed. R. Civ. P. 26(c).

[8] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

21. **Defendant Wyndham Hotel & Resorts, Inc.** ("Wyndham") is a large hotel brand with nearly 9,000 branded properties worldwide. Wyndham is a Delaware corporation with its principal place of business in Parsippany, NJ.

22. Wyndham maintains a registered agent in Ohio, and it can be served through its registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.

23. Wyndham is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of its predecessor. Where applicable, references to Wyndham in this Complaint refer also to Wyndham Worldwide Corporation.

24. Wyndham owned, supervised, managed, controlled, and/or operated the Super 8 located at 8711 N Sam Houston Pkwy E, Humble, TX 77396 ("Humble Super 8").

   a. The Super 8 is a Wyndham brand property.[9]

   b. Wyndham employees worked throughout the Humble Super 8 by Wyndham. Wyndham employees worked jobs including front desk and housekeeping. Wyndham is the principal with control over nearly every element of operations at the Humble Super 8 by Wyndham. Wyndham is liable, either directly, vicariously, or indirectly through an agency relationship for acts and/or omissions of the employees at its branded hotels, including the Humble Super 8 by Wyndham where C.C. was trafficked. Wyndham has an actual and apparent

---

[9] *Our Brands,* Wyndham Hotels, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited September 27, 2022).

agency relationship with the physical property owners of the Humble Super 8 by Wyndham as to establish vicarious liability.

c. Wyndham controlled and dictated the actions and inactions of the Humble Super 8 by Wyndham through highly specific and detailed brand standards, policies, and procedures.

d. Wyndham knowingly benefited, or received something of value, from its ventures at the Humble Super 8 by Wyndham through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where C.C. was trafficked, as well as in maintaining a positive public image for the Humble Super 8 by Wyndham. Wyndham also benefited from gathering personal data from the Wi-Fi it provided to customers including C.C. and her traffickers.

e. Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. Wyndham has derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that Wyndham engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Wyndham.

25. **Defendant Red Roof Inns, Inc ("RRI").** is a publicly traded company. The company provides franchise opportunities for its hotel and motel brands through **Defendant Red**

7

**Roof Franchising, LLC ("RRF")**.[10] Red Roof purchases, owns, and manages a network of hotels and motels globally, primarily in the Midwest, Southern, and Eastern United States. Red Roof serves customers throughout the United States and other countries throughout the World.

26. RRI is a global hotel brand with approximately 650 branded properties worldwide. It is a Delaware corporation, with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

27. RRI maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr. Suite 103 Upper Arlington, OH 43221

28. RRF was named one of the fastest growing franchises in 2017. It is a Delaware limited liability company with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

29. RRF maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr. Suite 103, Upper Arlington, OH 43221.

30. Red Roof owns, supervises, manages, controls, and/or operates the Red Roof Inn located at Red Roof Inn & Suites located at 9821 FM 1960, Humble, TX 77338 ("Humble RRI").

   a. The Humble RRI by Red Roof is a Red Roof branded property.[11]

   b. Red Roof employees work throughout the Humble RRI by Red Roof. Red Roof employees work jobs including front desk and housekeeping. Red Roof is the principal with control over nearly every element of operations at the Humble RRI by Red Roof. Red Roof is liable, either directly, vicariously, or indirectly

---

[10] Upon information and belief, Red Roof Franchising, LLC is a wholly owned subsidiary of Red Roof Inns, Inc. and serves as Red Roof Inns, Inc.'s franchising arm.

[11] *Our Brands*, RED ROOF, https://www.redrooffranchising.com (last visited Jun. 9, 2022); *Red Roof Inn*, RED ROOF, https://www.redrooffranchising.com/red-roof-inn (last visited Jun. 9, 2022).

through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Humble RRI by Red Roof where C.C. was trafficked. Red Roof has an actual and apparent agency relationship with the physical property owner of the Humble RRI by Red Roof as to establish vicarious liability.

c. Red Roof controlled and dictated the actions and inactions of the Humble RRI by Red Roof through highly specific and detailed brand standards, policies, and procedures.

d. Red Roof knowingly benefited, or received something of value, from its ventures at the Humble RRI through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where C.C. was trafficked, as well as maintaining a positive public image for the Red Roof Inn brand. Red Roof also benefited from gathering personal data from the Wi-Fi it provided to customers including C.C. and her traffickers.

e. Red Roof is subject to the jurisdiction of this Court because its corporate offices are headquartered in this district. In addition, Red Roof regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. Red Roof has derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Red Roof, the allegation is that Red Roof engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or

representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Red Roof.

## JURISDICTION AND VENUE

31.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

32.     The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act ("CAVRA").

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants Wyndham, RRI, and RRF.

34.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants Red Roof Inns, Inc. and Red Roof Franchising, LLC have their principal place of business within this District.

35.     Pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to Case Nos. 2:2021-cv-04935, 2:2019-cv-00849, 2:2021-cv-04933, 2:2021-cv-04934, 2:2022-cv-01924, 2:2021-cv-05022, 2:2022-cv-02682, 2:2022-cv-02683; 2:2022-cv-02690; 2:2022-cv-02734 2:2022-cv-03185; 2:2022-cv-03202; and 2:2022-cv-03203 currently pending before Chief Judge Algenon L. Marbley.

## FACTUAL BACKGROUND

### INTRODUCTION

36.      C.C. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a) and the Child Abuse Victim's Rights Act ("CAVRA"), 18 U.S.C. § 2255.

37.     The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1591, and thereby establishes a non-delegable duty of reasonable care.

38.     An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[12] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

39.     As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking at the branded properties. Furthermore, Defendants, did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

40.     Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Defendants did not establish a mandatory and secure reporting mechanisms at the point of sale.

41.     With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like C.C. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

---

[12] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

42.     Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

43.     Defendants are jointly and severally liable for the Plaintiff's damages in this case.

**THE SEX TRAFFICKING OF PLAINTIFF C.C.**

44.     C.C. met her traffickers when she was sixteen (16) years old.

45.     By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, C.C. was held captive and sold for sex by her traffickers.

46.     During the time that she was trafficked, C.C.'s traffickers frequently rented rooms at the Defendants' hotel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with C.C.

47.     Throughout her trafficking, C.C.'s traffickers connected with "johns" by posting or causing to be posted advertisements on Backpage advertising for C.C.'s availability for commercial sex. C.C.'s 's traffickers posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

48.     C.C. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

49.     While under the coercive control of traffickers, C.C.'s was imprisoned in hotel rooms rented by her traffickers and forced her to have sex for money. During that time, C.C. was trafficking in the following hotels:

       a.   Humble Super 8 located at 8711 N Sam Houston Pkwy E, Humble, TX 77396; and

b. Humble RRI located at 9821 FM 1960, Humble, TX 77338.

50. During the time she was trafficked, C.C.'s traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals.

51. While at the Defendants' hotels, C.C.'s traffickers violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape.

52. During her captivity at Defendants' hotels, C.C. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned in Defendants' brand hotels listed above.

53. At the above listed hotels, C.C. encountered the same staff on multiple occasions. Defendants' staff would have seen the signs of C.C.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Defendants' properties as well as signs of malnutrition and poor health.

54. Every time C.C. interacted with Defendants' staff it was readily apparent that C.C. was under the control of her traffickers who were significantly older than C.C.

55. C.C.'s traffickers followed a repetitive and routine procedure during stays at the Defendants' hotels and Defendants' hotels knew or should have known of C.C.'s trafficking because of a variety of factors detailed below:

**THE SEX TRAFFICKING OF C.C. AT THE HUMBLE SUPER 8 BY WYNDHAM**

56. Plaintiff C.C. was subjected to sex trafficking at the Wyndham branded, Humble Super 8 located at 8711 N Sam Houston Pkwy E, Humble, TX 77396.

57. Plaintiff and her traffickers stayed at the Humble Super 8 by Wyndham from May to August 2015, frequently staying for months at a time, within this period.

13

58. The Humble Super 8 by Wyndham staff were friends with C.C.'s traffickers. In fact, C.C.'s traffickers would regularly give a female employee rides to work. This employee knew that C.C. was being trafficked.

59. The Humble Super 8 by Wyndham front desk staff, including the owner of the hotel, saw one of C.C.'s traffickers hit her in the lobby of the hotel.

60. The staff would allow C.C. and her traffickers to rent out the entire third floor of Humble Super 8 by Wyndham and would permit them to smoke illegal substances.

61. C.C. remembers the name on the fake identification her traffickers forced her to use to check-in. Sometimes, her traffickers would check in using their real names.

62. C.C.'s traffickers were very violent with her at the Humble Super 8 by Wyndham both in the room and in public areas of the hotel.

63. At the Humble Super 8 by Wyndham, the staff C.C. would escort "johns," who were significantly older than her, from the front of the hotel to her room throughout the day and night. The foot traffic was also captured by security cameras, and staff had access to the footage.

64. Further, with each stay at the Humble Super 8 by Wyndham, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of used condoms in the trash; Physical abuse in public spaces; Unusually large number of male visitors coming in and out of the room; Asking the front desk not to be disturbed; Women wearing clothing inappropriate for the weather; Living out of hotel room; and Loitering and soliciting on hotel grounds.

65. Plaintiff was repeatedly raped and otherwise sexually abused thousands and thousands of times at Humble Super 8 by Wyndham.

14

66.     These red flags were open and obvious to anyone working at Humble Super 8 by Wyndham and lasted continuously for months.

**THE SEX TRAFFICKING OF C.C. AT THE HUMBLE RRI BY RED ROOF**

67.     Plaintiff C.C. was subjected to sex trafficking at the Red Roof branded Humble RRI located at 9821 FM 1960, Humble, TX 77338.

68.     Plaintiff and her traffickers stayed at the Humble RRI by Red Roof from May to August 2015, frequently staying for days at a time within this period.

69.     The Humble RRI by Red Roof staff allowed C.C.'s traffickers to pay for the room in cash by the hour.

70.     At the Humble RRI by Red Roof, the front desk staff saw C.C., visibly a minor, escort "johns" significantly older than her to and from her room at all hours of the day and night. This foot traffic was also captured by security cameras placed throughout the hotel.

71.     C.C. and her traffickers received complaints from other guests for smoking in the room at the Humble RRI by Red Roof.

72.      C.C. remembers the name on the fake identification her traffickers forced her to use to check-in at the Humble RRI by Red Roof. Sometimes, her traffickers would check in using their real names.

73.     C.C.'s traffickers were very violent with her at the Humble RRI by Red Roof both within the room and in public areas of the hotel.

74.     Further, C.C.'s stays at the Humble RRI by Red Roof, resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of used condoms in the trash; Physical abuse in public spaces; Visible signs of prior and private physical abuse; Unusually large

15

number of male visitors coming in and out of the room; Asking the front desk not to be disturbed; Women wearing clothing inappropriate for the weather; Living out of the hotel room; and Loitering and soliciting on hotel grounds.

75. Plaintiff was repeatedly raped and otherwise sexually abused many times at the Humble RRI by Red Roof.

76. These red flags were open and obvious to anyone working at the Humble RRI by Red Roof and last continuously for months.

**DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS**

77. Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[13] The United Nations,[14] international non-profits,[15] and the U.S. Department of Homeland Security,[16] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

78. For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States,

---

[13] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[14] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[15] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[16] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

16

identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

79. Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[17] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[18] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

80. The Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

---

[17] *The Blue Heart Campaign,* UNITED NATIONS (2022),
https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heino us%20crime.
[18] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015),
https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

81. The Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

82. The Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

83. A brief examination of just a handful of examples for each Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

### WYNDHAM

a. Regarding a stay in May 2013 at a Days Inn located at 10137 North Fwy, Houston, TX 77037 close to the Humble Super 8 by Wyndham, a hotel customer wrote a review saying, "1. Stained rugs up and down the first floor hallway.

2. Hookers await you like a Houston barrio valet service when you get out of your car. How nice is that? STD's come with Wi-Fi!!

3. My furniture had stains on multiple chairs and the lounge couch.

4. Flimsy doors to the rooms. I put a chair against my door because even though it had 2 locks on it it felt like a 10 yr old could kick it in.

5. Shady looking people surround the area at night, so basically make sure you have everything you need on you or in your room...oh and a GPS in

18

your truck just in case you walk outside in the morning and your vehicle isn't there.

6. TV's are from 1996.

7. Furniture reminds me of some of my ex-girlfriend's parents bedrooms I used to have sex in back around 1993.

8. I could hear people running up and down the halls all night upstairs. HOW AWESOME IS THAT?!?!?!"

b.   In 2017, a man was arrested for running a prostitution ring at a Super 8 Lake Jackson, Texas close to the Humble Super 8 by Wyndham.[19]

**RED ROOF**

c.  Regarding a March 2015 stay at the Humble RRI by Red Roof, a hotel customer wrote a review saying, "The people there were not the nicest. Drunks walking around everywhere, people smoking weed outside, drug dealer was living next door.. I could hear their conversations in the middle of the night they were talking so loud!! Police kept showing up!!."

d.  Regarding a March 2013 stay at a Red Roof Inn located at the 2960 W Sam Houston Pkwy S, Houston, TX 77042, close to the Humble RRI by Red Roof, a hotel customer wrote a review saying, "Never have I experianced such a terrible place. Hookers in rooms with outside doors tryin to proposition you as you walk by. Horrible. I am writing this to help warn people just how disgusting this hotel was.."

---

[19] KHOU Staff, *Man accused of running prostitution ring involving Alvin ISD minors,* KHOU, (March 22, 2017), https://www.khou.com/article/news/crime/man-accused-of-running-prostitution-ring-involving-alvin-isd-minors/285-424495364

e. In 2016, a hotel near the Humble RRI by Red Roof was shut down because of human trafficking and prostitution.[20]

**DEFENDANTS FACILITATED THE TRAFFICKING OF C.C.**

84. Each Defendant is a signatory of the Code[21] and thereby has promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

85. Defendant Wyndham is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

86. Defendant Red Roof is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Red Roof publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Red Roof should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

87. Defendants profited from the sex trafficking of Plaintiff C.C. Defendants rented rooms to and provided Wi-Fi to C.C.'s traffickers when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where C.C. was trafficked. The hotel staff, especially front desk staff, at Defendants properties knew or should have known of the obvious signs of C.C.'s trafficking.

---

[20] Alex Wukman, *Judge Orders Bissonnet Corridor Hotel Closed Because of Human Trafficking and Prostitution,* PATCH (August 25, 2016), https://patch.com/texas/houston/judge-orders-bissonnet-corridor-hotel-closed-because-human-trafficking-prostitution
[21] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

88. Defendants benefited from the steady stream of income that C.C.'s traffickers and "johns" bring to their hotel brands. Defendants profited from each and every room that C.C.'s traffickers and customers rented where C.C. was harbored and maintained for the purpose of sex trafficking. In addition, Defendants profited from data collected each and every time C.C.'s traffickers and customers used Defendants' Wi-Fi to advertise and solicit C.C. for commercial sex.

89. Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where C.C. was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

90. Moreover, Defendants repeatedly collected data on C.C., her traffickers, and her "johns" from her many stays at Defendants hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of C.C.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Defendants would have taken proper measures, Defendants would not have profited from C.C. and other victims like her being trafficked at their locations.

91. Defendants discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where C.C. was trafficked. These policies included ongoing

21

communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

92.     Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where C.C. was trafficked and reported this to Defendants or would have if Defendants did not fail to institute reasonable policies and procedures.

93.     In addition, Defendants had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

94.     Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

    a.  Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

    b.  Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

    c.  Collecting and utilizing massive amounts of data from all of their branded

locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

95. As a direct and proximate result of these egregious practices on the part of the Defendants, C.C. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS

96. Upon information and belief, it is a standard practice in the hospitality industry, followed by both Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

97. Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an

23

experience consistent with the standards of the parent hotel brand.  The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

98.     Defendants provide their branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a substantial extent controlled by Defendants.[22] Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[23]

99.     Upon information and belief, Defendants require its branded hotel properties to use a property management system, which is linked to Defendants' corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

100.     Upon information and belief, per the relevant franchise agreements,[24] Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

**WYNDHAM**

101.     Wyndham exercises day-to-day control over Humble Super 8 by Wyndham and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Wyndham implements and retains brand hotel control over, including control over the Humble

---

[22] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.

[23] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

[24] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

Super 8 by Wyndham where C.C. was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

102. Upon information and belief, Wyndham controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

a. Requiring the branded locations to use Wyndham's property management system;

b. Requiring branded locations to keep audit reports and other records;

c. Conducting regular inspections, quality assurance evaluation reports, and audits for compliance with franchise agreement terms and Wyndham's corporate policies;

d. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Wyndham's centralized systems;

e. Requiring the brands to regularly report data regarding customer feedback to Wyndham;

f. Providing marketing requirements and standardized marketing services for the branded locations;

g. Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

h. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access, security, filtering;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties

upon Wyndham's request and to refrain from make substantial changes to the branded property without Wyndham's permission;

k. Requiring branded properties to comply with Wyndham's Human Rights Policy and other laws;

l. Regulating the rates for room rentals; and

m. Insurance coverage requirements.[25]

103.    Wyndham manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham.[26]

104.    Wyndham controls uniform and required reservation, marketing, customer support systems and royalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Wyndham's website, and mentions across its corporate media channels.[27]

105.    Through its national sales team, Wyndham controls the credit processing system and the centralized direct billing at its brand hotels, including the Humble Super 8 by Wyndham where C.C. was trafficked.[28]

106.    Wyndham mandates branded properties source through Wyndham's global

---

[25] *See e.g.* 2014 Franchise Disclosure Document https://fddexchange.com/wp-content/uploads/2014/03/Days-Inn-Franchise-Disclosure-Document-FDD-July-12-2012.pdf
[26] *Our Brands*, WYNDHAM HOTELS, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited Jun. 15 2022).
[27] *Benefits of Partnering with Wyndham Hotels & Resorts,* WYNDHAM HOTELS, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 15, 2022).
[28] *Id.*

distribution system.[29] Wyndham mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Humble Super 8 by Wyndham where C.C. was trafficked.[30]

107.    Wyndham regulates property rate, inventory availability, and overall revenue management for the branded locations by monitoring hotel booking data for trends and patterns.[31]

108.    Wyndham manages its branded properties through its Oracle Hospitality OPERA Cloud Property Management System.[32] Wyndham's Development and Sourcing teams negotiate contracts on behalf of brands for hotel infrastructure, operating supplies and equipment and food and beverage.[33]

109.    Wyndham sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Humble Super 8 by Wyndham where C.C. was trafficked.[34]

110.    Wyndham is the employer of the staff at its branded properties. For example, Wyndham posts all hotel jobs on its parent website.[35] Wyndham is also responsible for setting the core values and culture for all Wyndham employees.[36] In addition, Wyndham sets forth policies

---

[29] *Benefits of Partnering with Wyndham,* WYNDHAM, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 20, 2022).

[30] *See e.g., id* ("[Our goal is to ensure the design and construction of your hotel is as seamless as possible, guided by the appropriate brand standards.")

[31] Id.

[32] *Wyndham Implements Oracle Hospitality OPERA Cloud Property Management in its Full-Service Hotels,* HOTEL TECHNOLOGY NEWS (May 18, 2021), https://hoteltechnologynews.com/2021/05/wyndham-implements-oracle-hospitality-opera-cloud-property-management-in-its-full-service-hotels/

[33] *Supra* n 103

[34] *Leveraging technology to deliver an exceptional guest experience,* WYNDHAM (Summer 2021) 4, https://developmentsupport.wyndham.com/files/8516/2869/4484/Tech-Guide-Q3-2021.pdf

[35] *Join the Wyndham Family,* WYNDHAM, https://careers.wyndhamhotels.com/ (last visited Jun. 22, 2022)

[36] *About Wyndham,* WYNDHAM, https://careers.wyndhamhotels.com/content/About-Wyndham/#culture (last visited Jun 22, 2022)

27

for, and provides employee benefits.[37]

111.　Wyndham first adopted a Human Rights Statement in 2007. According to the updated 2018 policy, Wyndham promises to comply with human rights laws and standards and has "accountability mechanisms" in place to monitor and report on compliance. Brand locations are required to comply with human rights and "operating standards." Failure to comply can result in the termination of the franchise agreement.[38]

**RED ROOF**

112.　Red Roof exercises day-to-day control over the Humble RRI by Red Roof and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Red Roof implements and retains brand hotel control, including control over the Humble RRI by Red Roof, as either direct subsidiaries or under the terms of its franchise agreements.

113.　Red Roof controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

   a. Providing the software, hardware, and platforms where data and information is shared with Red Roof corporate;

   b. Providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

   c. Providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

   d. Providing and controlling customer review and response platforms;

---

[37] *Our Benefits,* WYNDHAM, https://careers.wyndhamhotels.com/content/Our-Benefits/?locale=en_US (last visited Jun 22, 2022)

[38] *Human Rights Statement*, http://q4live.s22.clientfiles.s3-website-us-east-1.amazonaws.com/153757806/files/doc_downloads/governance_documents/Wyndham-Hotel-Resorts-Human-Rights-Policy-Statement.pdf (last visited Jun. 15, 2022).

e.  Hosting online bookings on Red Roof's domain;

f.  Requiring branded hotels to use Red Roof's customer rewards program;

g.  Requiring branded hotels to use Red Roof's property management software;

h.  Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

i.  Providing IT support for all property management systems, owned, operated, and required by Red Roof;

j.  setting employee wages;

k.  sharing profits;

l.  standardizing training methods for employees;

m.  building and maintaining the facility in a manner specified by the owner;

n.  standardized or strict rules of operation;

o.  regular inspection of the facility and operation by owner; and

p.  fixing prices.[39]

114.    Red Roof manages corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Red Roof.[40]

115.    Red Roof controls uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including the Humble RRI by Red Roof.[41] Red

---

[39] *See* 2021 Franchisee Disclosure Document, https://franchimp.com/?page=pdf&f=105990_2021.pdf

[40] *See e.g.*, *Brand Support*, RED ROOF, https://www.redrooffranchising.com/brand-support (last visited Jun. 9, 2022) ("We support our franchisees with extensive on-site training.  On everything from  helping  with  pricing strategy and operational expense management, to assistance with marketing and operation programs…Our cost-effective sourcing solutions, efficient technology support, and incredible property management system add even more value to your Red Roof franchise.")

[41] *Id.*

Roof also advertises its brand hotels through national press releases, newsletters, emails, announcements on redroof.com, and mentions across its corporate media channels.[42]

116. Red Roof requires its hotels to use a consolidated IT system and database for property management, credit processing and centralized billing, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated.[43]

117. Red Roof boasts of its "Streamlined Technology" and "Shared Success" with its brand hotels. To "make operations as easy and seamless as possible," Red Roof controls "a fully integrated database" which its brand hotels must use to access customer data and reservations, among other information shared system-wide between Red Roof and its brand hotels.[44] Red Roof's privacy policy states that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[45]

118. Red Roof also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Humble RRI by Red Roof.[46]

---

[42] *Brand Marketing*, RED ROOF, https://www.redrooffranchising.com/brand-marketing (last visited Jun. 9, 2022) ("From your grand opening to being fully operational, our team helps you market your property every step of the way. We provide property-specific design services for print materials—like flyers and rack cards—and even help with billboards, transit advertising, and other local promotional needs.")

[43] *See* Red Roof Franchising, available at https://www.redrooffranchising.com/technology; *See also Sales Team,* RED ROOF, https://www.redrooffranchising.com/sales-team (last visited Jun. 9, 27 2022) (corporate Red Roof employees provide brand staff with "regional events, webinars, and in-person visits" alongside training, other support, and "RediBill® Brand-Wide Direct Billing" centralized billing program).

[44] *Technology*, RED ROOF, https://www.redrooffranchising.com/technology (last visited Jun. 9, 2022); see also *Privacy Policy*, RED ROOF, https://www.redroof.com/privacy-policy (last visited Jun. 9, 2022).

[45] *Id.*

[46] *See* sigmawifi Red Roof Inn Case Study, *available at* https://www.sigmawifi.com/red-roof-inn-nh-case-study/

119.     In addition, through an integrated corporate marketplace, Red Roof mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Humble RRI by Red Roof.[47]

120.     Under the guise of maintaining its "brand standards," Red Roof forces its brand hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[48]

121.     Red Roof posts job openings for its branded properties on its central career positing website.[49] Red Roof provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.[50]

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

122.     Plaintiff incorporates each foregoing allegation.

123.     Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

124.     Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring,

---

[47] See *Operational Support Procurement Services*, RED ROOF, https://www.redrooffranchising. com/operational-support (last visited Jun. 6, 2022).
[48] *See Design and Construction,* RED ROOF, https://www.redrooffranchising.com/design-and-constuction (last visited Jun. 9, 2022).
[49] *See* https://www.redroofjobs.com/
[50] *Id.*

maintaining, soliciting, and advertising of Plaintiff for the purposes of commercial sex induced by force, fraud, or coercion.

125. Defendants have benefited as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff when they knew or should have known violations of §1591(a) were occurring. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages.

126. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels.

### COUNT 2: 18 U.S.C. § 2255(A) CHILD ABUSE VICTIMS RIGHTS ACT ("CAVRA") (AGAINST ALL DEFENDANTS)

127. Plaintiff incorporates each forgoing allegation.

128. Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

129. Plaintiff was the "victim" of violations of 18 U.S.C. §§ 1589, 1590, and 1591.

130. Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

131. Plaintiff was a "person" who "has not attained the age of 18 years" pursuant to 18 U.S.C. § 1591(a)(2).

132. Defendants knew or should have known that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause Plaintiff to engage in a commercial sex act, pursuant to 18 U.S.C. § 1591(a)(2).

32

133.     Defendants knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her traffickers rooms in hotels and Wi-Fi used advertise Plaintiff and solicit customers affecting interstate commerce where authorities were unlikely to discover the injuries being sustained by Plaintiff.

134.     Defendants knowingly benefited, financially or by receiving anything of value, from participation in ventures of renting rooms and providing Wi-Fi that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff to engage in commercial sex acts.

135.     Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.     Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.     Disgorgement of profits obtained through unjust enrichment;

c.     Restitution;

d.     Statutory and/or treble damages, where available;

e.     Punitive damages;

f.     Attorneys' fees and expenses;

g.     The costs of this action;

h.     Pre- and post-judgment interest; and

i.     Any other relief the Court or jury deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by struck jury.

Dated: October 25, 2022

Respectfully submitted,

*/s/ Steven C. Babin, Jr.*
Steven C. Babin, Jr. (0093584)
Jennifer J. El-Kadi (00100660)
Kristina Aiad-Toss (0101336)
Morgan Harper (*pro hac vice forthcoming)*
**Babin Law, LLC**
65 East State Street, Suite 1300
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com
Jennifer.elkadi@babinlaws.com
Kristina.aiad-toss@babinlaws.com
Morgan.harper@babinlaws.com